**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| A.M., Individually and on behalf of R.M., a minor, and all others similarly situated, | ) Case No.: |
| | ) |
| | ) CLASS ACTION COMPLAINT |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| BROCKTON AREA MULTI SERVICES, INC., | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| Defendant. | ) |
| | ) |

**CLASS ACTION COMPLAINT**

Plaintiff A.M. ("A.M" or "Plaintiff A.M.") individually and on behalf of R.M., her minor child, and all others similarly situated, through undersigned counsel, hereby alleges the following against Defendant Brockton Area Multi Services, Inc. ("BAMSI" or "Defendant"). Facts pertaining to Plaintiff A.M.'s and R.M.'s personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are based upon information and belief, *inter alia*, the investigation of Plaintiff A.M.'s counsel.

**NATURE OF THE ACTION**

1.      This is a class action for damages with respect to BAMSI for its failure to exercise reasonable care in securing and safeguarding enrollees' sensitive personal data—including names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, account numbers, diagnoses information, treatment information, and health insurance information ("Protected Health Information" ("PHI"), or "Private Information").

2.      This class action is brought on behalf of clients whose sensitive PHI was stolen by cybercriminals in a cyber-attack on BAMSI's computer systems that took place on or around April

14, 2023, and which resulted in the access and exfiltration of sensitive patient information (the "Data Breach").[1]

3.     BAMSI reported to Plaintiff, as R.M.'s mother, and members of the putative "Class" (defined below) that information compromised in the Data Breach included their PII and PHI.

4.     As a result of the Data Breach and Defendant's failure to promptly notify Plaintiff and Class Members of the Data Breach, Plaintiff, R.M., and Class Members have experienced and will experience various types of misuse of their Private Information in the coming months and years, including but not limited to, unauthorized credit card charges, unauthorized access to email accounts, identity theft, and other fraudulent use of their sensitive data.

5.     There has been no assurance offered by BAMSI that all personal data or copies of the confidential information have been recovered or destroyed.

6.     Accordingly, Plaintiff A.M. asserts claims for negligence, breach of contract, breach of implied contract, breach of fiduciary duty, and declaratory and injunctive relief.

## PARTIES

7.     Plaintiff A.M. is R.M.'s mother and a resident and citizen of East Bridgewater, Massachusetts. She brings this action on behalf of R.M., a minor, and on behalf of all others similarly situated.

---

[1] *BAMSI – Notice of Data Event,  https://www.bamsi.org/wp-content/uploads/2024/05/BAMSI-Substitute-Notice.pdf (last accessed September 30, 2024).*

8.     R.M. is Plaintiff A.M.'s eight-year-old daughter, who resides with her mother in East Bridgewater, Massachusetts.

9.     Defendant BAMSI is a 501(c)(3) nonprofit organization founded in Brockton, Massachusetts, that provides a wide array of services to children, adults, and families. Defendant maintains its principal place of business at 10 Christy's Drive, Brockton, MA 02301.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over the forthcoming claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class Member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

11.     The Court has personal jurisdiction over BAMSI because Defendant's principal place of business is located within this District.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). In addition, a substantial part of the events or omissions giving rise to the Class' claims occurred therein.

## FACTS

13.     According to its website, BAMSI is committed to "creating a holistic system of care that meets people where they are; and abolishing the stigmas surrounding mental illness, disability, and addiction."[2]   BAMSI also provides early intervention services to "infants and toddlers (birth to the age of 3) who are at risk of or experiencing a developmental delay."

14.     As part of its business, BAMSI is routinely entrusted with and therefore obligated

---

[2] About - BAMSI

to safeguard the Private Information of R.M. and the Class in accordance with all applicable laws.

15.    In July 2017, Plaintiff A.M. enrolled R.M. into BAMSI's early intervention program.

16.    In furtherance of the enrollment, Plaintiff A.M. was required to provide BAMSI with R.M.'s Private Information, as well as Plaintiff A.M.'s contact information, including her telephone number.

17.    R.M. graduated from the early-intervention program in or around January 2019.

18.    On April 14, 2023, BAMSI learned of unauthorized activity on its networks, which contained clients' Private Information.

19.    On May 16, 2024, more than thirteen (13) months after the Data Breach, Defendant announced that it suffered a cyberattack that allowed an unauthorized individual to obtain the Private Information of its clients stored within the company's computer systems.

20.    On that same day, BAMSI informed Plaintiff A.M. that R.M.'s Private Information was compromised in the Data Breach.

21.    Had Plaintiff A.M. known that BAMSI was unable to protect R.M.'s confidential information, she never would have enrolled her daughter in BAMSI's early intervention program.

22.    Upon information and belief, Plaintiff A.M.'s telephone number was also disclosed in the hacking incident, as she has endured an extreme increase in spam text messages since the Data Breach occurred.

23.    Since learning of the Data Breach, A.M. has made reasonable efforts to mitigate its impact on herself and R.M., such as researching and verifying the legitimacy of the Data Breach, checking her financial accounts for any indication of fraudulent activity, and ultimately retaining legal counsel.

24.     When BAMSI finally informed its affected clients of the Data Breach, it offered no explanation for the delay between the initial discovery of the Data Breach and the belated notification, which resulted in R.M. and Class Members suffering harm they otherwise could have avoided had BAMSI made a timely disclosure.

25.     BAMSI's notice of the Data Breach was not just untimely, but also woefully deficient, as it failed to provide basic details. For example, the notification was devoid of information related to how an unauthorized party accessed BAMSI's network, whether the stolen Private Information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach occurred system-wide, whether servers storing information were accessed, and how many clients were affected.

26.     Considering the types of personal information at issue and the fact that the Private Information was specifically targeted by cybercriminals with the intent to steal and misuse it, it can be inferred that R.M.'s and Class Members' PHI is being sold on the dark web, meaning that unauthorized parties have accessed, viewed, and exfiltrated their unencrypted, unredacted, sensitive personal information, including names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, account numbers, diagnoses information, treatment information, and health insurance information.

27.     The aforementioned impermissible exposure is a direct consequence of BAMSI's lax data security practices.

28.     The Data Breach has caused R.M. and A.M. to suffer fear, anxiety, and stress regarding the safety of their Private Information, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

29.     Consequently, Plaintiff A.M. anticipates spending considerable time and money attempting to mitigate the harms caused by the Data Breach.

30.     In fact, Plaintiff A.M. is currently trying to arrange credit monitoring services to protect R.M. from the likely consequences of BAMSI's inadequate data security practices.

31.     Nevertheless, R.M. and Plaintiff A.M. remain at risk and will continue to be at risk of identity theft and fraud for years to come.

32.     The Data Breach occurred because BAMSI failed to take reasonable measures to protect the PHI it collected and stored. Among other things, Defendant failed to implement data security measures designed to prevent such an attack, despite repeated warnings to the healthcare industry and associated entities about the risks and the highly publicized occurrence of many similar cyber-attacks in the recent past.

33.     In sum, BAMSI disregarded the rights of R.M. and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that R.M. and Class Members' PHI was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PHI of R.M. and Class Members was compromised through unauthorized access by an unknown third-party.

34.     Upon information and belief, Plaintiff A.M.'s, R.M.'s, and Class Members' Private Information remains in BAMSI's possession.

35.     Thus, Plaintiff A.M.'s, R.M.'s, and Class Members have a continuing interest in ensuring that their information is and remains secure from future unauthorized access and exfiltration.

**A.    BAMSI Failed to Maintain Reasonable and Adequate Security Measures to Safeguard the Private Information of its Clients**

36.    BAMSI acquires, collects, and stores a massive amount of its client's protected Private Information, including health information and other personally identifiable data.

37.    As a condition of receiving healthcare-related services, BAMSI requires that its clients entrust it with their highly confidential Private Information.

38.    By obtaining, collecting, using, and deriving a benefit from R.M. and Class Members' Private Information, BAMSI assumed legal and equitable duties and knew or should have known that it was responsible for protecting R.M. and Class Members' Private Information from disclosure.

39.    Moreover, BAMSI had obligations pursuant to the Health Insurance Portability and Accountability Act (42 U.S.C. § 1320d *et seq.*) ("HIPAA"), industry standards, common law, and representations made to Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

40.    As evidenced by BAMSI's failure to comply with its legal obligations established by HIPAA, Defendant failed to properly safeguard Class Members' Private Information, allowing hackers to access their confidential data.

41.    R.M. and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that BAMSI would comply with its obligation to keep such information confidential and secure from unauthorized access.

42.    In fact, BAMSI's privacy policy unequivocally declares its obligation to safeguard clients' Protected Health Information.[3]

_____

[3] *See, e.g.,* Notice of Privacy Practices - BAMSI (last visited October 1, 2024).

43.    Thus, BAMSI promised its clients that their Private Information would be kept confidential prior to and during the Data Breach.

44.    Defendant's failure to provide adequate security measures to safeguard client's Private Information is especially egregious because Defendant operates in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to clients' highly confidential data.

45.    In fact, BAMSI has been on notice for years that the healthcare and healthcare-related industries are prime targets for cyber-criminals due to the amount of confidential client information they maintain.

46.    Specifically, BAMSI was on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[4]

47.    The American Medical Association ("AMA") has also warned healthcare companies about the important of protecting their enrollees' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of enrollees' health and financial information, but also patient access to care.[5]

---

[4] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[5] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

48.    The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[6]  In 2017, a new record high of 1,579 breaches were reported—representing a 44.7 percent increase.[7]  That trend continues.

49.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[8] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[9] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[10]

50.    A 2017 study conducted by HIMSS Analytics showed that email was the most likely cause of a data breach, with 78 percent of providers stating that they experienced a healthcare ransomware or malware attack in the past 12 months.

---

[6]  Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/surveys-studys.
[7] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/.
[8] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report*, https://www.idtheftcenter.org/2018-data-breaches/.
[9]  Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.
[10] *Id.*

51.    In the Healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as "incredible."[11]

52.    Charged with handling sensitive PHI including healthcare information, BAMSI knew, or should have known, the importance of safeguarding its clients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on BAMSI clients as a result of a cyber security incident. BAMSI failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

53.    With respect to training, BAMSI specifically failed to:

- Implement a variety of anti-ransomware and other cyber security training tools, in combination with computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

54.    The PHI was also maintained on BAMSI's computer networks in a condition vulnerable to cyber-attacks. The mechanism of the cyber-attack and the potential for improper disclosure of R.M.'s and Class members' PHI was a known risk to BAMSI, and thus it was on

---

[11] Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results*, PROOFPOINT (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishingstatistics-2019-himss-survey-results.

notice that failing to take reasonable steps necessary to secure its clients' PHI from those risks left the highly sensitive data susceptible to unauthorized access and exfiltration.

**B.    The Monetary Value of Privacy Protections and Private Information**

55.    The fact that R.M. and Class Members' Private Information was stolen means that their information is likely for sale by cyber-criminals and will be misused in the future.

56.    At all relevant times, BAMSI was well aware that the Private Information it collects from its clients is highly sensitive and of significant value to those who would use it for nefarious purposes.

57.    Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[12]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information (including sensitive health information) on multiple underground Internet websites, commonly referred to as the dark web.

58.    In general, people place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much people value their data privacy, and the amount is considerable.

59.    Moreover, the value of R.M.'s and Class Members' Private Information on the black market is substantial. For instance, sensitive health information can sell for as much as $363.[13] This information is particularly valuable because criminals can use it to target victims with fraud and scams that take advantage of their respective medical conditions. Stolen PHI can also be

---

[12]    Federal    Trade    Commission,    *Warning    Signs    of    Identity    Theft*    (Sept.    2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

[13] Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

used to create fake insurance claims, allowing for the purchase and resale of medical equipment, and access to prescriptions for illegal use or resale.

60.     Medical identity theft can also result in inaccuracies in medical records and costly false claims, which can have life-threatening consequences. For example, if a victim's PHI is combined with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. Further, "victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[14]

61.     Additionally, victims of identity theft face significant economic harm, as studies have confirmed that the average direct financial loss for such victims in 2014 was $1,349.[15]

62.     The ramifications of BAMSI's failure to keep its clients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Moreover, Fraudulent activity might not become evident for 6 to 12 months, or even longer.

63.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[16] This gives thieves ample time to seek multiple treatments under the victims' names. For example, forty percent of individuals discovered they

---

[14] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.
[15] *See* U.S. Dep't of Justice, *Victims of Identity Theft, OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS* (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter Victims of Identity Theft].
[16] *See Medical ID Theft Checklist*, Identity Force https://www.identityforce.com/blog/medical-id-theft-checklist-2.

were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[17]

64.    Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[18] Indeed, when compromised, healthcare-related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[19] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Simply put, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[20]

65.    At all relevant times, BAMSI was aware, or should have been aware, that the Private Information it maintains is highly sensitive and could be used by cyber-criminals in furtherance of crimes, including identity theft and fraud. Moreover, BAMSI should have particularly been aware of these risks, given the significant number of data breaches affecting the healthcare industry and related entities.

---

[17] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[18] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, (2019) https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.
[19] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.
[20] *Id.*

66.     Had BAMSI remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented the instant cyber-attack of its systems and, ultimately, the theft of the Private Information of clients stored therein.

67.     The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to cyber-criminals. In fact, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[21] For example, different PHI elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[22] Based upon information and belief, the cyber-criminal(s) responsible for BAMSI's breach will utilize the pilfered sensitive data to obtain additional information about R.M. and Class Members that can be misused.

68.     In addition, as technology advances, computer programs may scan the Internet with wider scopes to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

69.     Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them

---

[21] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.

[22] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

to access victims' unaffected accounts. Therefore, even if payment card information was not involved in the Data Breach, the hackers could use R.M.'s and Class Members' Private Information to access their other accounts, such as email and financial accounts.

70.    Given these facts, any company whose business involves Private Information and then compromises the privacy of said data, has thus deprived affected individuals of the full monetary value[23] of their transaction with the company.

71.    In short, the Private Information exposed in the Data Breach is of great value to hackers and cyber- criminals. Hence, the compromised data can be used in a variety of unlawful and harmful ways.

## C.    BAMSI's Conduct violated HIPPA

72.    HIPAA requires covered entities like BAMSI to protect against reasonably anticipated threats to the security of PHI. Particularly, covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[24]

73.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

---

[23] Upon information and belief, some BAMSI clients use state programs and/or insurance coverage to pay for services.
[24] *What is Considered Protected Health Information Under HIPAA?*, HIPPA JOURNAL, https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.

74.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[25]

75.    BAMSI's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations. BAMSI's security failures include, but are not limited to, the following:

- Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

- Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

- Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

- Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

- Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

---

[25] *Breach Notification Rule*, U.S. DEP'T HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

- Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

- Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

- Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

- Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

## D.    BAMSI Failed to Comply with FTC Guidelines

76.    BAMSI was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

77.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[26]

---

[26] *Start With Security: A Guide for Business*, Fed. Trade. Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

78.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[27] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

79.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[28]

80.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.     BAMSI was at all times fully aware of its obligation to protect the Private Information of its clients because of its position as a provider of healthcare and healthcare-related

---

[27]     *Protecting Personal Information: A Guide for Business*, Fed. Trade. Comm'm (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.
     [28] *Start with Security*, *supra* note 32.

services.[29] BAMSI was also aware of the significant repercussions that would result from its failure to protect its clients' Private Information.

82.     As evidenced by BAMSI's failure to comply with its legal obligations established by the FTC Act, Defendant failed to properly safeguard Class Members' Private Information, thereby allowing hackers to access their confidential data.

**E.    BAMSI Failed to Comply with Healthcare Industry Standards**

83.     HHS's Office for Civil Rights has stated:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[30]

84.     HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

85.     Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of the value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to

---

[29] Programs offered by BAMSI are classified pursuant to the following categorizations: Behavioral Health, Developmental/Intellectual Disabilities and Autism Services, Medical/Physical and Brain Injury Services, Public Health and Community Resources, Educational Support and Services, and Family Support Services. Overview of Brockton Area Multi-Services, Inc. | Mass.gov

[30] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

cybersecurity threats.[31] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

86.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, BAMSI chose to ignore them. These best practices were known, or should have been known by BAMSI, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure its clients' Private Information.

**F.      Damages to R.M. and the Class**

87.     R.M. and the Class have been damaged by the compromise of their Private Information in the Data Breach.

88.     The ramifications of BAMSI's failure to keep Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that data and damage to the victims may continue for years. Notably, victims of data breaches are more likely to become victims of identity fraud.[32]

89.     In addition to its obligations under state and federal laws and regulations, BAMSI owed a common law duty to R.M. and Class Members to protect the Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the sensitive data in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

90.     BAMSI further owed and breached its duty to R.M. and Class Members to implement processes and specifications that would detect a breach of its systems in a timely

---

[31] *See, e.g., 10 Best Practices For Healthcare Security*, INFOSEC, https://resources.infosecinstitute.com/topics/healthcare-information-security/#gref.

[32] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

manner and to timely act upon warnings and alerts, including those generated by its own security systems.

91.    As a direct result of BAMSI's intentional, willful, reckless, and negligent conduct, an unauthorized party was able to access, acquire, view, publicize, and/or misuse R.M.'s and Class Members' Private Information, placing them at a heightened and increased risk of suffering identity theft and fraud.

92.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some individuals victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, identity theft victims may be arrested for crimes they did not commit.

93.    Some of the injuries and risks associated with the loss of the Private Information have already manifested in Plaintiff A.M.'s and other Class Members' lives. Specifically, Plaintiff A.M. has experienced an extreme influx of spam text messages since the Data Breach. As such, she now faces a certainly impending and substantial risk of a slew of future harms.

94.    R.M. and the Class have suffered or face a substantial risk of suffering out-of-pocket losses such as fraudulent charges on online accounts, credit card fraud, applications for benefits made fraudulent in their names, loans opened in their names, medical services billed in their names, and identity theft.

95.    Plaintiff A.M. (specifically on behalf of R.M.) and Class Members have, may have, and/or will have incurred out-of-pocket costs for protective measures such as credit monitoring

fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data

Breach. Indeed, Plaintiff A.M. is attempting to procure credit monitoring services for R.M.

96.    Furthermore, Class Members did not receive the full benefit of their bargain when

paying for medical services and/or providing their Private Information, and instead received

services that were of a diminished value to those described in their respective agreements with

BAMSI. Class Members were damaged in an amount at least equal to the difference in the value

between the services they thought they paid for (which would have included adequate data security

protection) and the services they actually received[33].

97.    R.M. and Class Members would not have obtained services from BAMSI had they

known that Defendant failed to properly train its employees, lacked safety controls over its

computer network, and did not have proper data security practices to safeguard their Private

Information from criminal theft and misuse.

98.    Plaintiff A.M. and the Class will continue to spend significant amounts of time

monitoring their financial and medical accounts for misuse.

99.    The theft of Social Security Numbers is particularly detrimental to victims. The

U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest

growing crimes in America."[34]  The SSA has stated that "[i]dentity thieves can use your number

and your good credit to apply for more credit in your name. Then, they use the credit cards and

don't pay the bills, it damages your credit. You may not find out that someone is using your number

until you're turned down for credit, or you begin to get calls from unknown creditors demanding

---

[33] Even if a third-party was responsible for payments, Class Members were nevertheless harmed by the loss of their benefits used for BAMSI services that did not meet expectations.
[34] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMIN. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.

payment for items you never bought."[35]  In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[36]

100.    In fact, a new Social Security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems.  If the old credit information is not associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit."[37]

101.    Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.  In the healthcare industry context, Private Information can be used to submit false insurance claims. As a result, R.M. and Class Members may face a real and continuing risk of identity theft and other issues associated with the disclosure of their Social Security numbers and will need to monitor their credit indefinitely, which creates unending feelings of fear and anxiety.

102.    As a result of the Data Breach, R.M.'s and Class Members' Private Information has diminished in value.

103.    The Private Information belonging to R.M. and Class Members is, as its name suggests, private, and was left inadequately protected by Defendant who did not obtain their consent to disclose such confidential data to any other person as required by applicable law, industry standards, and its own privacy policy. In sum, BAMSI disclosed information about R.M. and the Class that was of an extremely personal and sensitive nature due to its inadequate security measures.

_____

[35] *Id.*
[36] *Id.*
[37] *Id.*

104.    Thus, the Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect R.M.'s and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of R.M.'s and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

105.    BAMSI had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect the Private Information of its clients.

106.    BAMSI also failed to properly train its employees, particularly its information technology department, to timely identify and/or avoid such cyber-attacks.

107.    Had BAMSI properly trained its employees, remedied the deficiencies in its data security systems, and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and ultimately, the theft of R.M.'s and Class Members' Private Information.

108.    As a direct and proximate result of Defendant's wrongful actions and inactions, R.M. and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as school, work, and family in an effort to mitigate the potential and actual impact of the Data Breach on their lives.

109.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a

month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[38]

110. Other than offering credit monitoring to some, but not all affected persons, BAMSI did not take any measures to assist R.M. and Class Members with the likely and foreseeable consequences of the Data Breach.

111. BAMSI's failure to adequately protect R.M.'s and Class Members' Private Information has resulted in them having to undertake tasks intended to mitigate the potential fall-out of the Data Breach, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while BAMSI sits by and does nothing to assist every client affected by the cyber-attack.

112. While Defendant offered credit monitoring to some Class Members, this service does not guarantee the safety of Class Members' information. Thus, to mitigate harm, Class Members are now burdened with indefinite monitoring and vigilance of their accounts.

113. Furthermore, identity theft monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Private Information) – it does not prevent identity theft.[39] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

114. Pursuant to the above discussion, the Private Information stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources such

---

[38] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

[39] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-beworth-the-cost.html.

as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class Members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

115.    As a result of BAMSI's failures to prevent the Data Breach, Class Members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;

- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

- The continued risk to their Private Information, which remains in BAMSI's possession and is subject to further breaches so long as BAMSI fails to undertake appropriate measures to protect the Private Information in its possession;

- Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of their lives; and

- Anxiety and distress resulting from the fear related to misuse of their Private Information.

116.    R.M. and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and misuse.

## **CLASS ACTION ALLEGATIONS**

117.    Plaintiff A.M. brings this action individually and on behalf of R.M. and all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4).

118.    Specifically, Plaintiff A.M. proposes the following Class definitions:

> **Nationwide Class**
> All persons residing in the United States whose Private Information was compromised due to the Data Breach and who were sent notice of the Data Breach in May 2024 in their name and/or their child's name.
>
> **Massachusetts Subclass**
> All Massachusetts residents whose Private Information was compromised due to the Data Breach and who were sent notice of the Data Breach in May 2024 in their name and/or their child's name.

Excluded from the Classes are BAMSI and BAMSI's affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

119.    Plaintiff A.M. reserves the right to modify, change, amend, or expand the definition of the Classes based upon discovery and further investigation.

120.    Certification of Plaintiff A.M.'s claims for class-wide treatment is appropriate because Plaintiff A.M. can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

121.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of each Class are so numerous that joinder of all Members would be impracticable. On information and belief, the Classes number in the thousands. Moreover, the Classes are composed of an easily ascertainable set of individuals whose Private Information resided in Defendant's computer

systems and who were impacted by the Data Breach. The precise number of each Classes'
members can be further confirmed through discovery, which includes Defendant's records. The
disposition of Plaintiff A.M.'s and Class Members' claims through a class action will benefit the
parties and this Court.

122. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2)
and 23(b)(3).** Common questions of law and fact exist as to all members of each Class and
predominate over questions affecting only individual members of the Classes. Such common
questions of law or fact include, *inter alia*:

- Whether Defendant's data security systems prior to and during
  the Data Breach complied with applicable data security laws and
  regulations;

- Whether BAMSI's data security systems prior to and during the
  Data Breach were consistent with industry standards;

- Whether Defendant properly implemented its purported security
  measures to protect R.M.'s and the Classes' Private Information
  from unauthorized capture, dissemination, and misuse;

- Whether BAMSI took reasonable measures to determine the
  extent of the Data Breach after it first learned of same;

- Whether Defendant disclosed R.M.'s and the Classes' Private
  Information in violation of the understanding that the Private
  Information was being disclosed in confidence and should be
  maintained;

- Whether BAMSI willfully, recklessly, or negligently failed to
  maintain and execute reasonable procedures designed to prevent
  unauthorized access to R.M.'s and the Classes' Private
  Information;

- Whether Defendant was negligent in failing to properly secure
  and protect R.M.'s and the Classes' Private Information;

- Whether BAMSI was unjustly enriched by its actions; and

- Whether R.M. and the other members of the Classes are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

123.    BAMSI engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff A.M., on behalf of herself and R.M., and other members of the Classes. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

124.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff A.M.'s claims are typical of the claims of those of the Classes because, among other things, all Class Members were similarly injured and sustained similar monetary and economic injuries as a result of BAMSI's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to BAMSI that are unique to Plaintiff A.M.

125.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff A.M. is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she retained counsel competent and experienced in complex class action litigation, and Plaintiff A.M. will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff A.M. and her counsel.

126.    **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** BAMSI has acted and/or refused to act on grounds that apply generally to the Classes, making injunctive and/or declaratory relief appropriate with respect to the Classes under Fed. Civ. P. 23 (b)(2).

127.    **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy,

and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by R.M. and the members of each Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant. Hence, it would be impracticable for members of each Class to individually seek redress for Defendant's wrongful conduct. Even if members of the each Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

128.    Class certification is also appropriate under Rules 23(b)(1) and/or (b)(2) because:

a.    The prosecution of separate actions by the individual members of each Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for BAMSI;

b.    The prosecution of separate actions by individual Class Members would create a risk of adjudication that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c.    Defendant has acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive relief with respect to the members of each Class as a whole.

129.    No unusual difficulties are likely to be encountered in the management of this matter as a class action.

## COUNT I
## NEGLIGENCE
**(On Behalf of Plaintiff A.M., the Nationwide Class, and the Massachusetts Subclass)**

130.    Plaintiff A.M. fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

131.    Upon BAMSI's accepting and storing the Private Information of R.M. and the Class in its computer systems and on its networks, Defendant undertook and owed a duty to R.M. and the Classes to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. BAMSI knew that the Private Information was personal and confidential and should be protected as such.

132.    Defendant owed a duty of care not to subject R.M.'s and the Class' Private Information to an unreasonable risk of exposure and theft because they were foreseeable and probable victims of any inadequate security practices.

133.    Defendant owed numerous duties to R.M. and the Classes, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

134.    BAMSI also breached its duty to R.M. and Class Members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering its dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, despite the known risk

and foreseeable likelihood of breach and misuse, which permitted a malicious third-party to gain access to R.M.'s and Class Members' Private Information and potentially misuse the sensitive data.

135.    Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the healthcare and related industries.

136.    Defendant knew, or should have known, that its data systems and networks did not adequately safeguard R.M.'s and Class Members' Private Information.

137.    BAMSI breached its duties to R.M. and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard their Private Information.

138.    Because BAMSI knew that a breach of its systems would damage countless of its clients, including R.M. and Class Members, BAMSI had a duty to adequately protect its data systems and the Private Information contained therein.

139.    Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between itself, R.M., and Class Members, which is an obligation recognized by laws and regulations including but not limited to common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach, but failed to do so.

140.    In addition, BAMSI had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

141. Defendant also had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about an individual that—if it were to fall into the wrong hands—could present a risk of harm to the client's finances and/or reputation.

142. BAMSI's duty to use reasonable care in protecting confidential data arose not only due to the statutes and regulations described above, but also because BAMSI is bound by industry standards to protect confidential Private Information.

143. Defendant's own conduct also created a foreseeable risk of harm to R.M. and Class Members. Specifically, BAMSI's misconduct included failing to: (1) secure R.M.'s and Class Members' Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

144. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b. Failing to adequately monitor the security of its networks and systems;

    c.   Allowing unauthorized access to Class Members' Private Information;

    d.   Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

    e.   Failing to timely notify Class Members of the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages

145.    Through BAMSI's acts and omissions described in this Complaint, including its failure to provide adequate security and failure to protect R.M.'s and Class Members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, BAMSI unlawfully breached its duty to use reasonable care to adequately protect and secure their Private Information during the time it was within its possession or control.

146.    Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Class Members with timely notice that their sensitive Private Information had been compromised.

147.    Neither R.M. or the other Class Members contributed to the Data Breach and subsequent misuse of their Private Information, as described in this Complaint.

148.    As a direct and proximate result of Defendant's conduct, Plaintiff A.M, R.M., and Class Members have suffered damages, as alleged above.

149.    R.M. and Class Members are also entitled to injunctive relief requiring BAMSI to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class Members.

## **COUNT II**

## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff A.M., the Nationwide Class, and the Massachusetts Subclass)

150.    Plaintiff A.M. fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

151.    Through their course of conduct, BAMSI, Plaintiff A.M., and the Class Members entered into implied contracts for the provision of services, as well as implied contracts for BAMSI to implement data security adequate to safeguard and protect the privacy of their Private Information.

152.    Specifically, Plaintiff A.M. entered into a valid and enforceable implied contract with BAMSI for the provision of early-intervention services to R.M.

153.    The valid and enforceable implied contracts for services that Plaintiff A.M. and Class Members entered into with BAMSI include Defendant's promise to protect nonpublic Private Information given to it or that BAMSI created on its own from disclosure.

154.    When Plaintiff A.M. and Class Members provided Private Information to BAMSI in exchange for services, they entered into implied contracts with BAMSI pursuant to the agreement that it would reasonably protect such information.

155.    BAMSI solicited and invited Class Members to provide their Private Information as part of its regular business practices. Plaintiff A.M. and Class Members accepted BAMSI's offers and therefore provided Private Information.

156.    In entering into such implied contracts, Plaintiff A.M. and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

157.    Class Members reasonably expected that BAMSI would use part of the funds it received for services rendered to obtain adequate data security. BAMSI failed to do so.

158.    Under the implied contracts, BAMSI was obligated to: (a) provide secure services to R.M. and Class Members; and (b) protect R.M.'s and Class Members' Private Information provided to obtain the benefits of such services. In exchange, members of the Class agreed to pay (either through individual payment, state assistance, or insurance coverage) money for these services, and to turn over their Private Information in furtherance thereof.

159.    Both the provision of services and the protection of Plaintiffs' and Class members' Private Information were material aspects of these implied contracts.

160.    The implied contracts for the provision of services that include the contractual obligations to maintain the confidence of Plaintiffs' and Class Members' Private Information are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's Data Breach notification letter and Defendant's relevant privacy.

161.    BAMSI's express representations, including, but not limited to the express representations found in its privacy policy, memorializes and embodies the implied contractual obligation requiring it to implement data security adequate to safeguard and protect the privacy of R.M.'s and Class Members' Private Information.

162.    Consumers of healthcare and related services value their privacy, the privacy of their dependents, and the ability to keep confidential their Private Information associated with obtaining such services. Plaintiff A.M. and Class Members would not have entrusted Private Information to Defendant and would not have entered into their implied contracts with Defendant without an understanding that their sensitive data would be safeguarded and protected, nor would they have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that reasonable data security measures were adopted.

163.    Additionally, a meeting of the minds occurred. Particularly, Plaintiff A.M. and Class Members agreed and provided Private Information to BAMSI and paid for services in exchange for, among other things, the provision of healthcare and related services, and the protection of the Private Information.

164.    Plaintiff A.M., R.M., and Class Members performed their obligations under the respective contracts when they paid for (or arranged payment for) Defendant's services and provided Private Information in furtherance thereof.

165.    BAMSI materially breached its contractual obligation to protect the nonpublic Private Information it gathered when the information was accessed and exfiltrated via the Data Breach.

166.    BAMSI materially breached the terms of the implied contracts, including those provisions included in its privacy policy. BAMSI did not maintain the privacy of R.M.'s and Class Members' Private Information, as evidenced by its notifications of the Data Breach. Moreover, BAMSI did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect R.M.'s and Class Members' sensitive data.

167.    The Data Breach was a reasonably foreseeable consequence of Defendant's actions and/or inactions in breach of these contracts.

168.    As a result of BAMSI's failure to fulfill the data security protections promised in these contracts, R.M and Class Members did not receive the full benefit of their respective bargains, and instead received healthcare and related services that were of a diminished value to those described in the contracts. R.M. and Class Members, therefore, were damaged in an amount at least equal to the difference in the value between the services with data security protection anticipated and the services they received.

169.    Had Defendant disclosed that its data security was inadequate or that it did not adhere to industry-standard security measures, neither Plaintiff A.M., Class Members, nor any reasonable person would have obtained services from Defendant.

170.    As a direct and proximate result of the Data Breach, R.M. and Class Members will suffer actual damages and injuries, including without limitation the release, disclosure and loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses, and the loss of the benefit of the bargains they struck with BAMSI.

171.    R.M. and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

172.    R.M. and Class Members are also entitled to injunctive relief requiring BAMSI to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff A.M., the Nationwide Class, and the Massachusetts Subclass)

173.    Plaintiff A.M. fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

174.    In providing Private Information to BAMSI, Plaintiff A.M. and Class Members justifiably placed a special confidence in BAMSI to act in good faith and with due regard for their interests and to safeguard the sensitive data provided.

175.    BAMSI accepted the special confidence Plaintiff A.M. and Class Members placed in it, as evidenced by its assertion that BAMSI is committed to protecting the privacy of their personal information, pursuant to the Data Breach notification letters.

176.    Considering the special relationship between BAMSI, Plaintiff A.M., R.M., and Class Members, BAMSI became a guardian and fiduciary of their Private Information. Consequently, BAMSI was expected and obligated to act primarily for the benefit of its clients, including R.M. and Class Members, specifically regarding the safety of their Private Information.

177.    BAMSI breached its fiduciary duties to R.M. and Class Members by failing to protect the integrity of the systems containing their Private Information.

178.    As a direct and proximate result of BAMSI's breach of its fiduciary duties, R.M. and Class Members have suffered and/or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information;  (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the  remainder of their lives;  and (vii) the diminished value of the services they expected and received.

**COUNT IV**

## DECLARATORY RELIEF
### (On Behalf of Plaintiff A.M., the Nationwide Class, and the Massachusetts Subclass)

179.    Plaintiff A.M. fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

180.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those present here, that are tortious and violate the terms of the federal statutes described in this Complaint.

181.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard R.M.'s and Class Members' Private Information, including their PHI, and whether Defendant is currently maintaining data security measures adequate to protect R.M. and Class Members from future data breaches that compromise their Private Information. R.M. and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

182.    The Court should also issue prospective injunctive relief requiring BAMSI to employ adequate security practices consistent with law and industry standards to protect its clients' PHI and other Private Information.

183.    BAMSI still possesses R.M.'s and the Class' Private Information.

184.    To Plaintiff A.M.'s knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

185.    Thus, if an injunction is not issued, R.M. and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another BAMSI data breach.

186.    The risk of another such cyber incident is real, immediate, and substantial.

187.    The hardship to R.M. and Class Members if an injunction is not issued exceeds the hardship to BAMSI if an injunction is issued. Among other things, if another BAMSI data breach occurs, R.M. and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to BAMSI of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and BAMSI has a pre-existing legal obligation to employ such measures.

188.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another BAMSI data breach, thereby eliminating the additional injuries to R.M. and Class Members, along with other clients whose Private Information would be further compromised.

189.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that BAMSI implement and maintain reasonable security measures, including but not limited to the following:

    a.    Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on BAMSI's systems on a periodic basis, and ordering BAMSI to promptly correct any problems or issues detected by such third-party security auditors;

    b.    engaging third-party security auditors and internal personnel to run automated security monitoring;

    c.    auditing, testing, and training its security personnel regarding any new or modified procedures;

d.  purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

e.  conducting regular database scans and security checks; and

f.  routinely and continually conducting internal training and education to inform security personnel how to identify and contain a breach when it occurs, and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff A.M. individually and on behalf of R.M. and the members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiff A.M. and the Class and against BAMSI, as follows:

A.  For an Order certifying this litigation as a class action and appointing Plaintiff A.M. and her counsel to represent the Class;

B.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of R.M.'s and Class Members' Private Information, and from failing to issue prompt, complete, and accurate disclosures to Plaintiff A.M. and Class Members;

C.  For equitable relief compelling BAMSI to utilize appropriate methods and policies with respect to client data collection, storage, and safety, and to disclose with specificity the type of PHI and Private Information compromised during the Data Breach;

D.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.    Ordering BAMSI to pay for no less than three (3) years of credit monitoring services for R.M. and the Class;

F.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.    For an award of punitive damages, as allowable by law;

H.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees (if applicable);

I.    Pre- and post-judgment interest on any amounts awarded; and

J.    Such other and further relief as this court may deem just and proper.

## **JURY DEMAND**

Plaintiff A.M. demands a trial by jury on all issues so triable.

Dated:  October 9, 2024                              Respectfully submitted,

/s/*Nicholas A. Migliaccio*
Nicholas A. Migliaccio*
Jason Rathod*
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington, D.C. 20002
Telephone: (202) 470-3520
*nmigliaccio@classlawdc.com*
*jrathod@classlawdc.com*
(*pro hac vice forthcoming)

-AND-

/s/ *Richard E. Levine*
Richard E. Levine (BBO# 672675)
STANZLER LEVINE, LLC
37 Walnut Street, Suite 200
Wellesley, MA 02481
Tel: (617) 482-3198
rlevine@stanzlerlevine.com

Attorneys for Plaintiffs